BRIDGET McCULLEN, Respondent, v. FISHELL BROTHERS AMUSEMENT COMPANY, Appellant.

St. Louis Court of Appeals. Opinion Filed December 4, 1917.

1. **PLEADING: Construction: Sufficiency of Petition after Verdict.** After verdict and judgment, a petition is not open to attack, if by reasonable implication or fair intendment it sets up facts sufficient to constitute a cause of action.

2. **TRIAL PRACTICE: Demurrer to Evidence: Inferences.** In passing on a demurrer to plaintiff's evidence, the evidence is to be viewed in the light most favorable to plaintiff; and every inference fairly and legitimately deducible therefrom should be drawn in his favor.

3. **NEGLIGENCE: Master and Servant: Actions: Evidence.** In an action against the proprietor of a theater for the wrongful death of one who fell through an open trapdoor, evidence *held* to warrant a finding that the trapdoor had been opened and left open by the proprietor's servant, acting in the scope of his authority.

4. ————: **"Invitee," "Licensee," Who are: Distinguished.** Where deceased, an expressman, came to defendant's theater to do some hauling, in which defendant was mutually interested with deceased's employer, and went upon the stage in the course of that business, and, in the darkness fell through an open trapdoor which defendant's servant had left open, deceased was an "invitee," being upon the stage for the mutual benefit of his employer and defendant, and hence defendant was bound to exercise ordinary care for his protection; deceased as an "invitee" distinguished from a "licensee" not being upon the stage for his own pleasure or benefit.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Thomas C. Hennings,* Judge.

AFFIRMED.

*Holland, Rutledge & Lashly* for appellant.

(1) The petition does not state cause of action. It alleges that appellant maintained an open trapdoor and that deceased, while lawfully on the premises, fell through same. There is no allegation of an invitation. The owner of premises owes no duty to trespassers or mere licensees to keep the premises in reasonably safe condition. O'Brien v. Western Steel, 100 Mo. 182; Straub v. Soderer, 53 Mo. 38; Schmidt v. Kansas City Distilling Co., 90 Mo. 284; Whittee v. Stifel, 126 Mo. 295; Butz v. Cavanagh, 137 Mo. 503; Benson v. Baltimore Traction Co., 77 Mo. 535; Sterger v. Van Sticklen, 132 N. Y. 499; McGill v. Compton, —Ill. 327; Evansville v. Terre Haute R. R., 100 Ind. 221; Muench v. Heinemann, 96 N. W. (Wis.) 800; Ryerson v. Bathgate, 51 Atl. 708; Manning v. Railroad, 16 L. R. A. 271; Redigan v. Railroad, 14 L. R. A. 276. (2) (a) The peremptory instruction asked by appellant should have been given. While there was testimony that appellant was to receive a portion of the receipts of the firm of Wilson & Jones, there was no evidence that appellant was to take

any part in the business of said firm or share the losses thereof. Therefore, there was no partnership relation between the firm of Wilson & Jones and appellant. Mackie v. Mott, 146 Mo. 230; Sille Hardware & Iron Co. v. McCleverty, 89 Mo. App. 154; Mulholland v. Rapp, 50 Mo. 42; Bank of Odessa v. Jennings, 18 Mo. App. 65; Hansom v. Jones, 20 Mo. App. 595; Weise v. Moore, 22 Mo. App. 530; Hach v. Hill, 160 Mo. 18; Lockhart v. Forsythe, 49 Mo. App. 654; Ileyerle v. Hunt, 50 Mo. App. 541. (b) The firm of Wilson & Jones, while operating on the stage of appellant's theater, was operating as an independent contractor, and appellant was not liable for any negligence on the part of said firm. Burns v. McDonald, 57 Mo. App. 599; Kaiser v. Suppe, 133 Mo. App. 29; Burnes v. Railroad, 129 Mo. 41; Byre v. Jordan, 111 Mo. 428. (c) Where one normally and generally in the employ of A is loaned by A to B and operates under B's direction, such person is temporarily the servant and agent of B. and B. alone is liable for his negligent acts. Healy v. Wrought Iron Range Co., 161 Mo. App. 482; Hardy v. Shedden Coal Co., 477 U. S. App. 362; Standard Oil Co. v. Anderson, 212 U. S. 215; Nason v. Railroad, 22 U. S. App. 220.

*Ryan & Thompson* for respondent.

(1) The objection that the petition fails to state facts sufficient to constitute a cause of action should be ruled against appellant. Appelgate v. Railroad, 252 Mo. 173; Robinson v. Seay, 175 Mo. App. 713; Schneider v. Johnson, 164 Mo. App. 639. (2) Plaintiff's deceased husband came upon defendant's premises as an invitee of defendant and defendant owed him the duty of protecting him against traps and pitfalls. Glazer v. Rothschild, 221 Mo. 180; Appelgate v. Railroad, 252 Mo. 173; Moore v. Corte, 77 Mo. App. 500; Welsh v. McCallister, 15 Mo. App. 492; Bennett v. Railroad Co., 102 U. S., 585; Northwestern Electric R. Co. v. O'alley, 107 Ill. App. 599, 604; Cleveland, etc., Railway Co. v. Powers, 88 N. E. 1073 (Ind.); Note in 46 L. R. A. 59; Burner v. Higman, 127 Iowa 590; Sheyer v. Lowell, 134 Cal. 357;

Tobin v. Railroad Co., 59 Mo. 185; Kinchlow v. Elevator Co., 57 Kan. 374; Atlanta Cotton Seed Oil Mills v. Coffey, 80 Ga. 145; Panckner v. Wakern, 231 Ill. 276.

ALLEN, J.—Plaintiff is the widow of Andrew J. McCullen, deceased, and sues to recover damages for his death resulting from injuries sustained by him by reason of falling through an opening or "trapdoor" in the floor of a stage in a theatre building operated by defendant in the city of St. Louis.

It is charged that defendant negligently allowed the trapdoor to remain open, and that on July 6, 1913, plaintiff's husband, while lawfully upon the premises, and in the exercise of due care, fell through the opening to the floor below sustaining injuries from which he died on October 2, 1913. The answer contains a general denial and a plea of contributory negligence, and alleges that plaintiff's husband was not invited upon the premises and had no right to be there.

The trial, before the court and a jury, resulted in a verdict for $5000 in plaintiff's favor, and from a judgment accordingly entered thereon the defendant prosecutes the appeal.

The evidence discloses that during the period with which we are here concerned the defendant was a corporation with but three stockholders, viz., Dan Fishell, his brother, and a third person; the two stockholders other than Dan Fishell, being, it is said, merely "nominal stockholders." Dan Fishell was president of the company, and was referred to by a witness as having been "the whole show."

On and prior to July 6, 1913, defendant, engaged in conducting theatrical performances, was the lessee of a building known as the Princess Theatre, in the city of St. Louis, fronting on the east side of Grand Avenue near Olive Street. The stage, located in the east end of the building, extended across the entire building, i. e., from the south wall to the north wall, and it appears that in the floor thereof were a large number of trapdoors. Beneath the stage were basement rooms in which

defendant's theatrical properties were kept, the granitoid floor of the basement being about eighteen feet below the level of the stage. In the south wall of the building was a large sliding door, operated by raising and lowering it, which opened from the stage upon an alley.

One Wilson and one Jones were actors in defendant's service, and had been with defendant for some years. In June, 1913, as the "theatrical season" was about to close, Wilson and Jones conceived the plans of forming a little theatrical company of ten persons from those who had been performing at defendant's theatre, for the purpose of giving certain performances during the summer of that year in "air-domes" in the city of St. Louis and elsewhere. It appears that when Fishell, defendant's president, learned of this, he summoned Wilson and Jones to his office on or about June 25, 1913, and, referring to the matter, said (as stated by Jones in testifying) that "he wanted to know where his bit was coming in," stating that he ought to get something out of the proposed venture. The evidence is that Wilson and Jones told Fishell that they could not give him any interest in the undertaking unless he would put something into it; that Fishell then suggested that they did not have the necessary wardrobe and scenery and would require a place for rehearsals, and that he would furnish these things. And it appears that after figuring out the "salary list" it was agreed that the defendant would furnish the wardrobe, scenery and theatre for rehearsals; that Wilson and Jones would pay the salaries of the members of the company, paying themselves each $50 a week as salary; and that the surplus over and above all expenses would be divided between the defendant and Wilson and Jones, defendant receiving fifty per cent. thereof. It was agreed, however, that defendant was not to bear any part of the losses, if any. It appears also that, at the instance of Fishell, it was then agreed that the "company" would be increased from ten to sixteen members.

One Nortemann was defendant's "property man," having been in defendant's employ for nearly three

years. He was the custodian of defendant's wardrobe and stage scenery, and kept the key to the room in which these articles were stored. And the evidence is that, when the foregoing matters had been agreed upon, defendant's president called Nortemann into his office and in the presence of Wilson and Jones instructed Nortemann to give them whatever properties they might want; and that it was arranged that whenever Wilson and Jones might thereafter desire any of the properties they would notify Nortemann who was instructed to get them out and deliver them at the theatre.

It further appears that on June 26, 1913, defendant's president again called Wilson and Jones into his office and told them that he had arranged with the manager of "Delmar Garden" for the "company" to play the following week at that place, but it seems that for some reason this was not done. And it is said that defendant's president sent out a great many letters to various towns in Missouri and Illinois, endeavoring to "book" the company in those places.

After having given certain performances in the city of St. Louis this little company was engaged for a performance at a certain air-dome in that city, to be given on the evening of Sunday, July 6, 1913; and on the morning of that day Jones met Nortemann, by appointment, at defendant's theatre for the purpose of getting out certain stage properties of defendant for use in giving the performance mentioned, including a "drug store counter." It appears that Nortemann knew what properties were desired and proceeded at once to get them out. He raised one of the trapdoors in the defendant's stage, laid it against the rear or east wall of the building, and with the help of a watchman raised the counter from the basement through the trapdoor opening and placed it upon the stage floor. It was found to be too long for the purpose for which it was desired, and Nortemann procured a saw and set about sawing off a portion of it. In the meantime the trapdoor, which, it is said, was about six feet in length and three feet wide, was left open. The opening was about three feet from the east wall, or rear

of the stage, and about fifteen feet north of the sliding door opening upon the alley. The evidence is that Nortemann allowed the trapdoor to remain open for the reason that he intended to lower to the basement that portion of the counter which was not to be used; and in this connection he testified that it was his duty to "put back all the stuff." And according to Nortemann's testimony the trapdoor remained open a half hour or more.

Andrew J. McCullen was a drayman or "expressman," and either Wilson or Jones had previously arranged with him by telephone to bring an express wagon to haul the properties which they were to take from defendant's theatre on that Sunday morning. While Nortemann was engaged in sawing the counter, McCullen drove his wagon into the alley mentioned and up to the sliding door opening upon the stage. Jones met him at this door and upon looking at his wagon told him that it was not large enough. There is a slight but immaterial conflict in the testimony as to precisely what occurred at this time. It appears that either McCullen asked permission to use the telephone to call up his "boss" and have a larger wagon sent, or that McCullen stated that he could get the properties on the wagon and that Jones took issue with this and told him to come in and look at the articles to be hauled. In any event McCullen, following Jones, entered the doorway and was proceeding across the rear of the stage, where it was quite dark as compared with the brightness of day without, when he stepped into the opening mentioned and fell to the granitoid basement floor below, receiving injuries which later, to-wit, on October 2, 1913, caused his death. Jones testified that while crossing the stage, in advance of McCullen, he spoke to the latter saying, "look out for the trapdoor;" but if the witness did this, it does not appear that McCullen heard him.

Nortemann, who had been regularly in defendant's employ for years, was never employed by Wilson and Jones "under salary." Jones said: "We would probably tip him a little money." He received nothing from Jones, by way of a tip or otherwise, on the Sunday mentioned.

He testified that Wilson paid him during the following week, in Jacksonville, Illinois; that Wilson gave him one dollar for ''that work'' and for what he ''had coming up there.''

## I.

The first contention of appellant is that the petition wholly fails to state a cause of action. The argument of appellant's counsel is that by merely alleging that McCullen ''was lawfully on said stage'' the petition does not charge that McCullen was on the premises by the invitation of appellant; and that unless the deceased was an invitee, and not a mere licensee, appellant owed him no duty except not to wilfully injure him. But after verdict and judgment a petition is not open to attack if by reasonable implication or fair intendment it sets up facts sufficient to constitute a cause of action. And tested by this rule we think that this petition—which was not attacked below except by an objection to the introduction of evidence in the nature of a demurrer *ore tenus*—is amply sufficient to support the judgment. The allegation that the deceased was lawfully upon the premises is broad enough to include the idea that he was there by the express or implied invitation of the defendant, and it may well be inferred that plaintiff intended that this allegation should be so taken. We consequently disallow this assignment of error.

## II.

It is earnestly contended that the trial court erred in refusing to peremptorily direct a verdict for defendant, but we regard it as quite clear that this assignment of error is without merit. There is indeed but little, if any, conflict in the evidence, but in so far as any conflict may be said to exist it is elementary that in passing upon the demurrer the evidence is to. be viewed in the light most favorable to plaintiff, giving plaintiff the benefit of every favorable inference which may be fairly and legitimately drawn therefrom.

That the evidence warrants the conclusion that in leaving open the trapdoor, while sawing the counter,

Nortemann was acting as defendant's servant, in the pursuit of defendant's business, cannot well be doubted. He was the custodian of defendant's property and as such he was delivering it pursuant to defendant's directions. And according to his testimony he left open the trapdoor in order to replace in the basement the portion of the counter which was not to be used, for the reason that it was his duty, as defendant's servant, to so replace all articles not used. But this is by no means the entire case made by plaintiff. The evidence goes to show that McCullen was on the premises at the implied invitation of defendant, by reason whereof defendant owed him the duty to exercise ordinary care to keep its premises in a reasonably safe condition, free from dangerous traps and pitfalls. This follows from the evidence adduced showing that the defendant corporation was interested with Wilson and Jones in the undertaking for which the little theatrical company was formed; defendant having an interest in the profits, in consideration for which defendant furnished a place for rehearsals, wardrobe and scenery. And it appears that defendant's president took an active part in the management of the business pertaining to the enterprise. It thus appears that McCullen came to defendant's theatre that Sunday morning upon a matter of business in which defendant, Wilson and Jones were all interested, and for a purpose—to-wit to take from defendant's premises the very properties which defendant had agreed to supply in the · undertaking mentioned— which was for the mutual benefit and advantage of all parties to the immediate transaction. McCullen was there in the course of his business, or that of his employer, but the business was one for the defendant's benefit and advantage as well as for the benefit and advantage of the other parties interested with defendant in having the properties moved from defendant's building. Under these circumstances McCullen was upon defendant's premises as an invitee, by virtue of an im-

plied invitation to enter thereupon in the transaction of the business mentioned. And the fact that he was summoned by Jones or Wilson and not by defendant in no wise affects the application of the rule of law pertinent to the matter in hand.

In 17 R. C. L., p. 566, it is said: "The principle on which the courts distinguish a case of implied license from one of implied invitation, in the technical sense, seems to be this: Speaking generally, where the privilege of user exists for the common interest or mutual advantage of both parties, it will be held to be a case of invitation; but if it exists for the mere pleasure and benefit of the party exercising the privilege it will be held to be a case of licensee."

This statement of the text is amply supported by the authorities in this State and elsewhere.

In Glaser v. Rothschild, 221 Mo. 180, l. c. 184, et seq., 120 S. W. 1, it is said:

"The general rule is that the owner or occupier of premises lies under no duty to protect those from injury who go upon the premisis as volunteers or merely with his express or tacit permission from motives of curiosity or private convenience in no way connected with business or other relations with the owner or occupier.

\*     \*     .  \*     \*     \*

"But the situation with reference to liability radically charge when the owner invites the use of his premises for purposes connected with his own benefit, pleasure and convenience. . . . The rule applicable to that change is that a licensee who goes upon the premises of another by that other's invitation and for that other's purposes, is no longer a bare licensee. He becomes an invitee and the duty to take ordinary care to prevent his injury is at once raised, and for the breach of that duty an action lies.

\*     \*     \*     \*

"The word 'invitation' used in the rule covers and includes in it enticement, allurement and inducement, if

the case in judgment holds such features. . . . So, too, it is held in all the cases that the invitation may be implied by any state of facts upon which it naturally and reasonably arises.''

In this connection see also: Appelgate v. Railroad, 252 Mo. 173, 158 S. W. 376; Pauckner v. Wakem, 231 Ills. 276; Bennett, v. Railroad, 102 U. S. 577.

Applying the foregoing sound and well established rules of law to the facts disclosed by this record, we have no hesitation in holding that the demurrer to the evidence was properly overruled.

Complaint is made of the giving of plaintiff's main instruction covering the case and directing a verdict, being the only instruction given for plaintiff with the exception of one on the measure of damages. This instruction is quite lengthy and it is unnecessary to here set it out, since the attack made upon it is fully disposed of by what we have said above.

Error is also assigned to the refusal of the court to give a number of instructions asked by the defendant. These need not be discussed in detail. They either proceeded upon erroneous theories as to the legal effect of the evidence adduced, or were not supported by the evidence. A careful examination of all of them reveals that the court committed no error in refusing them.

We perceive no reversible error in the record, and it follows that the judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Becker, J.,* concur.